PACE v. RICHARDSON.

Opinion delivered April 8, 1918.

1. ATTORNEY'S FEES—SERVICES RENDERED—QUANTUM MERUIT.— Plaintiff, an attorney, agreed to perform certain legal services for one R., a minor, *held,* even though the contract was void, that the allegations of the complaint showed plaintiff entitled to recover on a *quantum meruit.*

2. MARRIED WOMEN—INFANCY—RIGHT TO CONTRACT.—A married female who is a minor and who has not had her disabilities of non-age removed can not make any valid contract concerning her property nor manage nor control the same.

3.  MARRIED· WOMAN—INFANCY—GUARDIANSHIP.—In so far as the Act
    of April 22, 1873, Kirby's Digest, § 3824, upon marriage, terminates
    the guardianship or curatorship of minor females, it is repealed by
    the constitution of 1874.

4.  GUARDIAN AND WARD—CURATORS.—The term "guardians" as used
    in Art. 7, § 34, of the Constitution of 1874, includes "curators."

5.  MARRIED WOMAN—INFANCY—CONTROL OF ESTATE BY CURATOR.—
    Where a minor is under fourteen years of age at the time of her
    marriage, the probate court has jurisdiction, notwithstanding her
    marriage, to appoint for her a guardian or curator who, under the
    statute, has the care and management of her estate subject to the
    superintending control of the court.

6.  MARRIED WOMAN—INFANCY—APPOINTMENT OF GUARDIAN—CON-
    TRACT WITH ATTORNEY.—The probate court may appoint a guardian
    or curator for a minor, who is a married woman, and may confirm and
    approve a contract made by the guardian with an attorney, thereby
    binding the minor's estate to the payment of an attorney's fee for
    certain definite services to be rendered, and such contract is valid.

7.  ATTORNEY'S FEES—SERVICES RENDERED—CONTRACT.—Appellant, an
    attorney, entered into a contract with the guardian of an infant
    married woman, to perform for her certain legal services. The
    claim of the infant was settled by compromise. *Held*, under the
    testimony that appellant was entitled to the fee agreed to be paid
    him in the contract.

Appeal from Independence Chancery Court; *George T. Humphries*, Chancellor; reversed.

*H. L. Ponder*, for appellant.

1.  The court had jurisdiction. 85 Ark. 101.

2.  The guardian was duly appointed. K. & C. Dig. § § 4225, 4168, 4175; Const. 1874; Art. 937; 64 Ark. 381; 15 A. & E. Enc. L. 46; 12 R. C. L. 1117; Peck· on Dom. Rel. § 135; 15 Ky. L. Rep. 237; 18 Tex. 367; 18 N. J. Eq. 204; 15 Abb. Pr. 12; 2 Am. Law J. 128; 47 Ark. 558; 26 R. I. 351; K. & C. Dig. § 6082.

3.  The appointment of a guardian was valid (*supra*) and he had authority to make the contract under the direction of the probate court. 38 Ark. 146; 98 *Id.* 63; 85 *Id.* 104.

4.  The contract was fair and reasonable. 35 Ark. 247-276. The fact that the estate was recovered by com-

promise does not affect the contract. 211 U. S. 335, 365; 8 S. W. 831.

5.   There was no neglect of duties and it was not necessary to employ other counsel.   103 Ark. 513; 39 *Id.* 340; 33 *Id.* 545.

6.   If the contract was uninforceable when executed she afterwards ratified it after her disabilities were removed.   She accepted the fruits and agreed to pay the fee.   84 Ark. 610; 15 *Id.* 73; 22 Cyc. 544.

7.   If the contract is invalid as to Mrs. Richardson, then her husband is bound because he acted as agent of an infant.   22 Cyc. 584-7.

8.   Even if the contract is void appellant is entitled to recover on a *quantum meruit*, at least $25,000.   66 Ark. 190; 33 *Id.* 545; 38 *Id.* 149; 34 Ia. 594; 58 Fed. 462; 30 La. Ann. 336; 33 *Id.* 857; 37 Mich. 14; 21 L. R. A. 418; 54 Minn. 434; 53 N. Y. 438; 10 Abb. N. C. 15; 121 N. Y. S. 589.   The fee charged was reasonable.   The decision of the chancellor is against the law and the evidence.

*Hal L. Norwood, Ira J. Mack, L. B. Poindexter* and *W. K. Ruddell,* for appellees.

1.   The court had no jurisdiction.   85 Ark. 101; 128 Ark. 416.

2.   The probate court had no power to appoint a curator as she was a married woman. Kirby's Digest, § 3824; 38 Ark. 494; 12 R. C. L. 1117.

3.   The curator had no authority to make the contract.   14 Ark. 339; Tiffany on Persons and Dom. Rel. 312; 15 A. & E. Enc. Law (2d Ed.) 70; 37 Ark. 425; 131 Am. St. 730; 54 L. R. A. 354; 75 Ark. 40; 85 *Id.* 101.

4.   Only a reasonable fee could be allowed on *quantum meruit*.   75 Ark. 40; 85 *Id.* 101; 128 Ark. 416; 120 S. W. 350; 146 *Id.* 1117; 108 *Id.* 526; 65 Ark. 437; 8 La. Ann. 65; Weeks on Attys. at Law, 721.

5.   There was no ratification.   Kirby's Dig. § 3668; K. & C. Dig. § 3999.   Nor is she estopped. 95 Am. Dec. 572-4.

6. The contract is the whole basis of the suit. The question of Mr. Richardson's liability was not raised below and can not be now raised. 76 Ark. 48; 81 *Id.* 476.

7. Neither of appellees was personally liable by the alleged contract. There should be no recovery on *quantum meruit.* 88 Ark. 550-6; 111 *Id.* 554; 128 Ark. 416; 98 Ark. 529, 533.

8. The fee is unreasonable. 6 C. J. § 354; 106 Ark. 571; 122 *Id.* 21.

9. The chancellor's findings will be sustained unless clearly against the preponderance of the evidence. 89 Ark. 309; 97 *Id.* 537; 181 S. W. 913; 121 Ark. 302, and many others.

10. The court had no jurisdiction of the item of $686.55 so as to declare it a lien.

### STATEMENT OF FACTS.

W. J. Erwin, designated in the record as "Major Erwin," lived near Batesville, Independence County, Arkansas. He died October 22, 1914, at the age of 81 years. He possessed an estate consisting of real and personal property valued at between two and three hundred thousand dollars. He left a widow, Mrs. Ida L. Erwin and a grandchild, Mrs. Willie Alexander Richardson. The latter at the time of Major Erwin's death was a minor and had intermarried with Richardson when she was about thirteen years of age. Major Erwin was twice married, he had three children by his first wife and none by his second. Mrs. Richardson was the daughter of Major Erwin's only son. Her father had died when she was very young. She went to reside with her grandfather when she was nine years of age and lived with him for about four years.

Before she went to live with her grandfather he had executed a will in which he bequeathed about three-fourths of his estate to her. After this he executed what purported to be a will by which Mrs. Erwin was given all his property except the sum of $50, which was bequeathed

to the granddaughter.   After this, deeds were also executed conveying all the real estate of Major Erwin to his wife, and an instrument was also executed transferring to her all his personal estate except a small amount.

Richardson and his wife claimed that she had been driven from the home of her grandfather on account of the enmity and studied cruelty of Mrs. Erwin and that this and the execution of the purported will and deeds disinheriting her was a scheme concocted by Mrs. Erwin to obtain all the property.

Major Erwin when about seventy-eight years of age had a stroke of paralysis, and Richardson and his wife claim at the time the purported will and deeds, disinheriting the grandchild, were executed, he, on account of his affliction and great age, was virtually a mental imbecile and was thus easily brought under the sinister influences of Mrs. Erwin, who caused him to execute these instruments.

With a view of protecting whatever interest his wife might have in the estate of Major Erwin, while he was living, and of recovering the same for her after Erwin's death, Richardson consulted attorney Frank Pace. Richardson himself was a lawyer and he explained the affairs of the Erwin estate and his wife's relation thereto, as above set forth from Richardson's viewpoint. The result was that Richardson, acting for his wife, and Pace agreed upon the terms of a proposed contract by which Pace was to be employed for the purposes above indicated and at a compensation agreed upon and expressed in the contract. Pace concluded that inasmuch as Mrs. Richardson was a minor it was necessary to have a guardian appointed for her and that the contract which they had tentatively entered into be made by her guardian and approved by the probate court. Accordingly, J. R. Vinson, on proper application, was appointed guardian of Mrs. Richardson and he, as guardian, and Pace entered into a contract by which Pace was employed "to represent the said minor and to protect her interest in said estate whatever that

may be and recover for her any portion of said estate that she is entitled to.''

The contract as to the compensation Pace was to receive specified as follows: ''If the amount recovered from said estate for said minor be seventy-five thousand dollars, or less than that amount, said attorney is to receive one-third of the amount so recovered. If the amount recovered be not less than seventy-five thousand dollars, nor more than one hundred and fifty thousand dollars, party of the second part is to receive as a fee for his services the sum of twenty-five thousand dollars. If the amount recovered for said minor be more than one hundred and fifty thousand dollars, and less than two hundred thousand dollars, the said attorney shall receive as a fee for his services the sum of thirty thousand dollars. If the sum recovered for said minor be more than two hundred thousand dollars and less than two hundred and twenty-five thousand dollars, then said attorney is to receive as a fee for his services the sum of thirty-five thousand dollars. If the sum recovered be more than two hundred and twenty-five thousand dollars, then said attorney is to receive as a fee for his services the sum of forty thousand dollars, said fee to be paid out of the estate when recovered. That should there be a settlement and an adjustment of said estate before the death of the said W. J. Erwin, satisfactory to the party of the first part, then in that event, said party of the second part shall receive as a fee for his services the sum of ten thousand dollars.''

The contract was O. K'd. by Richardson and his wife and confirmed and approved by the probate court.

Pace entered upon the performance of his contract. About the time Major Erwin died Pace employed T. M. Seawel, an attorney who then resided in Springfield, Mo., to assist him in the anticipated litigation over the estate.

The first legal step taken was the filing of a citation in the probate court asking that Mrs. Erwin be required to produce the will, which she did. The will as above stated bequeathed to Mrs. Richardson only $50. Pace pre-

pared and filed a complaint setting forth exceptions to the probate of the will. The litigation thus begun was afterwards compromised through the efforts of Pace and the attorneys of Mrs. Erwin. As the result thereof Mrs. Richardson acquired title to real and personal property, from the estate of Major Erwin, valued at not less than one hundred thousand dollars and not more than one hundred and fifty thousand dollars. Mrs. Richardson paid to Pace the sum of twelve thousand five hundred dollars and refused to pay more.

Pace instituted this suit in the chancery court of Independence County based on the contract above mentioned. He alleged that it had been duly performed by him and that under its terms he was entitled to recover the sum of $30,000 and that he had a lien upon the property which Mrs. Richardson received and which he described in his complaint. He also set up that he had advanced at the request of the defendants the sum of $686.55 which was due and unpaid. He prayed judgment for the aggregate sum of $30,686.55 with interest at six per cent. less the $12,500 previously paid.

The defendants filed a general demurrer to the complaint and an answer denying the validity of the contract entered into between Vinson, the guardian of Mrs. Richardson, and Pace. They admitted that plaintiff aided other counsel in affecting a compromise of defendants claims under which she received property out of Major Erwin's estate not exceeding the value of $100,000, but denied that plaintiff was entitled to recover the sum demanded or any other sum. They admitted that plaintiff had been paid the sum of $12,500 but denied that said sum was paid on the contract. They denied that plaintiff was entitled to a lien upon the property received by Mrs. Richardson. They averred that at the time the alleged contract was executed Mrs. Richardson was a minor, fourteen years of age; that the appointment of the guardian was procured for her by the plaintiff in order, if possible, to validate the contract; that Major Erwin was living at

that time and in order to secure the consent of defendants
to the contract plaintiff induced defendants to take from
him from time to time money amounting to $686.55 which
was done on account of their great financial stress, that
the contract was therefore champertous and that it was
unjust, unconscionable, and extorted from the defendants.
They also alleged that if the contract was valid that plain-
tiff had breached the same by failing to carry out the
duties and burdens imposed by its terms; that he had in-
tentionally neglected and refused to care for the interest
of Mrs. Richardson in the Erwin estate and had thereby
compelled her to employ other attorneys to protect her
rights.    They made their answer a cross-complaint and
set up that they had paid the sum of $12,500 in order to
settle with him and after receiving the same he had neg-
lected and refused to further represent defendants and
that they were forced to employ other counsel whom they
paid the sum of $2,775.    They alleged that plaintiff's
services did not exceed in value the sum of $5,000 and
they prayed that they have judgment against plaintiff for
the sum of $7,500.

The plaintiff denied specifically the allegations of the
cross-complaint.

On the day of the trial defendants filed a special de-
murrer alleging that Mrs. Richardson was a married per-
son at the time the guardian was appointed and that the
order appointing the guardian was a nullity.

The court decreed "that plaintiff was not entitled to
recover under the contract, but found that he rendered
valuable services which inured to the benefit of the estate
of the defendant, Willie Alexander Richardson, and that
the reasonable value of the services was $12,500; that
defendants had paid that sum to plaintiff prior to the in-
stitution of this suit and that it had no jurisdiction as to
the item of $686.55 loaned by plaintiff to defendant Rich-
ardson and dismissed the complaint as to this item with-
out prejudice and entered a decree for defendants, dis-

missing the complaint for want of equity and for costs against the plaintiff." ,

The plaintiff duly prosecuted this appeal. Other facts stated in the opinion.

WOOD, J., (after stating the facts).

(1) Even though the contract sued on were void the allegations of the complaint are sufficient to entitle appellant to recover on a *quantum meruit*. The chancery Court had general jurisdiction over the subject matter in enforcing the alleged lien of attorney Pace on the property alleged to have been recovered by him for his client, Mrs. Richardson. *Greenlee* v. *Rowland,* 85 Ark. 101.

Appellees contend that the probate court had no authority to appoint a guardian under section 3824 of Kirby's Digest which provides "that every guardian or curator shall continue in office, unless discharged according to law, until the ward shall arrive at full age or if a female until her marriage, if that event shall first happen; and when any guardian or curator shall be entitled to his discharge according to law, he shall make a just and true exhibit of the account between himself and ward for the purpose of a final settlement of his guardianship accounts, et cetera." This act was approved April 22, 1873. This particular section of the statute relates to the final settlement of guardians and curators who are discharged by the marriage of their infant female wards and does not expressly prohibit the appointment of guardians and curators for married infants. But if the existing guardianship or curatorship of such infants terminates *ipso facto* with their marriage it would seem by necessary implication at least that no guardian or curator could be appointed under the statute for a married infant female.

The above statute is merely declaratory of the common law. At common law the guardianship of a female minor ceased at her marriage for the reason that a continuation of guardianship would be incompatible with the marital rights of the husband.

The rule that the marriage of the female ward terminates the guardianship "evidently arose," says Ruling Case Law, "from the fact that the marital obligations of either a husband or wife are inconsistent with, and in their nature superior to, the guardian's right to control of the person; and that at the common law the wife by marriage conferred on the husband the entire control, and nearly the entire beneficial interest, in her property." 12 R. C. L. p. 1117, sec. 19. See also *Mendes* v. *Mendes,* 1st Ves. Sr. pp. 89-91; *Porch* v. *Fries,* 3rd C. E. Greene, N. J. Eq. pp. 204-207.

As the husband at the common law took the control over the person and the property of his wife the necessity for the continuation of the guardianship after marriage of the female minor ceased. Hence the rule.

But the Act of April 28, 1873, sec. 5207, Kirby's Digest, and article 9, sec. 7, of the Constitution of 1874, give to a married woman the entire management and control over her real and personal property and the right to dispose of, and to own and enjoy the income from such property the same as if she were a *feme sole.* To effectuate the purpose of these provisions for the protection of the rights of married women in their separate property it becomes necessary in the case of a married female minor that a curator of her estate be appointed. Our married woman's act of 1873 is modeled after a statute passed in 1848 in New York which provides "that the real and personal property of any female who may hereafter marry, and which she shall own at the time of her marriage, and the rents, issues, and profits thereof, shall not be subject to the disposal of her husband, nor be liable for his debts, and shall continue her sole and separate property, as if she were a single female."

In the *Matter of Herbeck,* 16 App. Pr. Rep. (N. S.) pp. 214-217, the Surrogate, construing this statute, said: "If the common law on this subject still prevails, notwithstanding the act of 1848, then does it not follow as a necessary corollary, that the husband may recover and

take to his own use her legacy or distributive share, and other *choses in action,* and thus defeat the very design of that act? Thus all the safeguards the law and the courts have erected so carefully to protect the estate of infants, would be at once beaten down.''

(2-3)    A married female who is a minor and who has not had her disabilities of non-age removed can not make any valid contract concerning her property nor manage nor control the same. Every reason that existed at the common law and under our statute of April 22, 1873, for the termination of guardianship upon the marriage of a female minor has been obliterated by the Constitution and the statute of this State for the benefit and protection of married women concerning their separate property. These later provisions are in conflict with, and therefore, by necessary implication, repealed the act of April 22, 1873, *supra,* in so far as that act terminates, upon marriage, the guardianship or curatorship of minor females.

(4)    The probate court under our Constitution has exclusive original jurisdiction in matters relative to guardians. Article 7, sec. 34, of the Constitution of 1874. The term ''guardians'' in the Constitution is used in its broad sense and includes curators. This was the sense in which the term ''guardian'' was used in the application for and in the order of the court appointing J. R. Vinson guardian of Willie Alexander Richardson.

(5)    Mrs. Richardson at the time of her marriage was under fourteen years of age, therefore it follows that the probate court had jurisdiction, notwithstanding her marriage, to appoint for her a guardian or curator who under the statute had the care and management of her estate subject to the superintending control of the court. Sec. 3777, Kirby's Digest; *Waldrip* v. *Tulley,* 48 Ark. 297.

(6)    The contract entered into between Vinson and Pace was one which the court in advance authorized and afterwards confirmed and approved. The order of the court appointing Vinson for the purpose of entering into this contract and confirming and approving the same con-

stituted the contract as one made under the orders and directions of the probate court for the preservation of the estate of Mrs. Richardson. The court had such jurisdiction and the contract was in all respects valid. See *Watson* v. *Henderson,* 98 Ark. 63.

(7)   Appellees contend that Pace breached the contract "by failing to carry out the duties and burdens imposed upon him by its terms." They alleged in their answer that "by the terms of the contract plaintiff was to have the sole care and charge of the interest and claims of the defendant, Willie A. Richardson, in and to the estate of said W. J. Erwin and to recover for her any portion of said estate that she was entitled to despite the terms of any will which might be left, but that plaintiff, instead of doing this, intentionally and carelessly neglected and refused so to do and failed to look after and care for the interests of the said Willie A. Richardson in said estate, and it thereby became necessary for her to, and she did, employ other attorneys to represent her in order that her rights might be looked after and protected and proper actions and suits brought and prosecuted, and to this end she was forced to and with the knowledge of plaintiff did retain and hire for the protection of her interests and the assertion of her rights, and to do what plaintiff's alleged contract says he was to do, other attorneys," et cetera.

To sustain these allegations appellees rely entirely upon the testimony of V. G. Richardson who assumed to act as the representative and spokesman of his wife. He testified, "my wife employed the additional attorneys other than Mr. Seawel because I realized that Mr. Pace was incompetent, or at least I couldn't get him to give the time necessary for a case the magnitude this one was. He didn't give it the attention, for when I would call him up or write him he would state he would not be up here at a certain time. I put constant pressure upon him from the time the case started until it was over to act and act quickly when the occasion presented itself. It develops

in his deposition that he thought we did not have a strong case, and I think there could not have been a better case in the country of undue influence and incapacity. I paid the other attorneys the following amounts: Sam Casey $5,000; Dene Coleman $1,000; Sam Moore $1,000; Earl Casey $500; Henry Bickers $500 and W. K. Ruddell $350. These attorneys were employed because Mr. Pace was not giving the case the attention he should. I do not think that Mr. Pace was in Batesville more than ten days during the entire time he represented my wife. I do not think Mr. Seawel was here over six days or seven days in all. * * * All the attorneys as to the method of procedure acted on my suggestion. As to preparing the law of the case and taking care of the law in it, Mr. Seawel and Mr. Sam Casey took care of that. I want to add to that statement that Mr. Pace didn't proceed in the probate court as I wished him to. Mr. Seawel appeared in the U. S. Court and prepared the answer in the U. S. Court and looked after the law end of the case, together with Mr. Casey. All the papers that were filed in the case I think were prepared in skeleton form in Little Rock and sent to Mr. Casey here who perfected and filed them here. I know it was generally understood that Mr. Seawel and Mr. Casey were looking after the law end of the case.''

In regard to the compromise Richardson testified in substance that Pace sent for him to come to Little Rock to talk compromise. He didn't want to compromise; had not instructed Pace to work up the compromise, and he did it of his own accord. He thought that if the suit had gone ahead that his wife would have gotten all the property, as Mrs. Erwin was a cousin of Major Erwin and their marriage was therefore illegal. Further as to the compromise he stated that Pace after seeing Moore, Smith & Moore, attorneys for Mrs. Erwin, reported that they offered to give one-half of the estate provided that witness' wife would pay one-half of the fees of Mrs. Erwin's attorneys. After some discussion witness said he thought his wife would be willing to compromise if she

could get half of the estate and Mrs. Erwin pay her own attorney's fees. Pace went to see Moore, Smith & Moore and upon returning stated that Mrs. Erwin offered to give witness' wife half of the estate and each one pay her own attorney's fees. Witness told Pace "in view of all the facts in the case and feeling that he wasn't capable of handling the case, and feeling that I couldn't afford to discharge him at that time, my wife submitted, or I for her, and she was to get half of the estate and pay her own attorney's fees and Mrs. Erwin pay her own attorney's fees."

Witness goes into detail showing the reason why, in witness' opinion, Pace after his employment had not taken the steps which witness thought he should have taken and were necessary to be taken in order to properly protect Mrs. Richardson's estate and to recover for her that to which in witness' opinion she was entitled. In the course of his testimony as showing the opinion of the witness as to the services rendered by Pace witness says: "His (Pace's) whole attitude from the start was to grab what he could and get out with the least trouble."

The testimony is too long to quote further, but the above presents its salient features.

Pace testified that after he was employed he had frequent conferences with Richardson who acted as the agent of his wife and who "was very active in the prosecution of the matter from the beginning to the end and was very efficient." In this connection Pace likewise generously conceded that the attorneys who had been employed by Richardson rendered him valuable assistance. He says, "I want to add further that out of my fee I employed Mr. Seawel, and that not only was I present but he was present at every material step in the trial, and that after he was employed nothing was done without full consultation between himself and myself in connection with it, and that while we had valuable assistance from the attorneys who represented Mr. Richardson in Batesville, their work was only cumulative of what we did. I want to say that I

appreciated the value of their support and their assistance and that Mr. Richardson was a very active and satisfactory client during the litigation.''

Pace further testified denying that there was any reason for the employment of other counsel on account of any neglect on his part to perform his contract. He denied that he had been reproached by Mr. Richardson for any neglect of duty. On the contrary he says, ''that Richardson never during the entire litigation or at any time afterwards until he filed his answer made any complaint to me that I had neglected his business in any way or had neglected to do my whole duty in connection with this case.''

Pace's testimony shows that soon after he was employed, Richardson who was then living in Little Rock, expressed a desire to move back to Batesville. Pace encouraged the idea in order that Richardson might be on the ground to discover what testimony he might be able to find that would tend to show that Erwin did not have mental capacity to make the will or that undue influence was exercised over him by Mrs. Erwin and others in procuring the will in her favor to be executed. Richardson desired certain steps to be taken, such as appointing a guardian for Major Erwin and other steps looking to the conservation of the estate which witness did not deem advisable unless absolutely essential to avoid losing a substantial part of the estate. But there was no intimation by Richardson that he was dissatisfied with Pace's conduct in this particular. Pace detailed the steps that were taken by him and Seawel after the death of Major Erwin in the performance of his contract.

He had the will under which Mrs. Erwin claimed produced in the probate court. He filed exceptions to the probate of the will. While these issues as to the probate of the will were pending Mrs. Erwin filed the deeds and instrument conveying to her virtually all Major Erwin's property. Mrs. Erwin was then living in Tennessee. Pace and Seawel filed a bill in the chancery court to set

aside these instruments. That case was transferred to
the Federal court. The defendant in the Federal court
filed an answer and counter-claim, asking that her title to
the property be quieted and that she be allowed to retain
possession of same until the end of the litigation. Be-
fore the case was transferred to the Federal court, how-
ever, Pace and Seawel had procured the appointment of
an administrator of the estate of Major Erwin. They
had also made application to the chancery court and had
procured an order appointing the administrator receiver
of the estate. After the case was pending in the Federal
court they made application before that court for the ad-
ministrator to be appointed receiver by that court to take
charge of the property. They had a citation issued from
the probate court directed against certain parties to dis-
cover whether there were other assets of the estate that
had not been delivered up by Mrs. Erwin to the adminis-
trator. The contest over the probate of the will was
heard and the probate court refused to probate the will
and Mrs. Erwin appealed.

While these proceedings were pending in the several
courts Pace approached Mr. Smith of the firm of Moore,
Smith & Moore, attorneys for Mrs. Erwin, in order to
effect a compromise. He states the matter was thor-
oughly discussed with Richardson and the reasonableness
of the contention of the parties on the other side was
dwelt upon. They had discovered in their investigation
that under the terms of the will made in 1907 Mrs. Rich-
ardson, the beneficiary of that will, would not get posses-
sion of the property directly. It was bequeathed to a
trustee to hold in trust and out of the rents and profits
the beneficiary was to be educated and at the age of
twenty-five years he was to turn over to her one-fourth
of the personal property and each year thereafter one-
fourth until she had received all the property of the es-
tate.

The terms of this will were unsatisfactory to Rich-
ardson and his wife and there was also some evidence to

show that even at that time Major Erwin had no mental capacity to make a will. So that, even if they had succeeded in setting aside the will under which Mrs. Erwin claimed, it was not certain that the will of 1907 would not have also gone down. Furthermore they had learned that prior to the will of 1907 Major Erwin had made another will in which his grand-daughter, while still an infant and living with her mother in Memphis, was practically disinherited. They had found no evidence to show that Major Erwin at the time he made this the first will (in 1902) disinheriting his grand-daughter was of unsound mind. They had discovered that there were witnesses, present at the time the will in favor of Mrs. Erwin was made, who would have testified that Major Erwin was of sound mind and fully understood what he was doing, realizing that he was giving all the property to his wife and disinheriting his grand-daughter. Other witnesses, who were not present at the time the will was made but who were intimately associated with him, would have stated that while he was weak in body there was never a time when he did not have sufficient mind to know what he was doing and to know the relationship and the deserts of those whose names were mentioned in the will.

Pace concludes his testimony concerning the reasons inducing him to propose, and to agree upon, the compromise, as follows: "After reviewing all of the testimony that would bear upon the mental condition of Major Erwin at the time he made the last will we were not satisfied that we had such a case, even though it might be submitted to a jury, that we could win it there or that it would be affirmed in the Supreme Court on appeal. In addition to this fact there was the further fact that the validity of the will was pending in the State court, and the question as to the validity of the deed, and the instrument conveying the personal property, made some four or five months after the time that the will was made, was pending in the Federal court, and to recover anything for our client it

was necessary for us to set aside the deed and the conveyance of the personal property in the Federal court.

"Taking the whole situation into consideration, we felt, after consulting with Mr. Richardson and Mr. Vinson, the guardian, the other parties interested, that it was well to compromise the case."

His testimony shows that after the agreement to compromise was reached, one of the steps taken in order to effectuate it was a suit instituted in the chancery court by Mrs. Richardson against Vinson, her guardian, in which all the facts in connection with the case were set up in the complaint, and the chancery court was called upon to determine whether or not such settlement was for the best interests of the minor, and, if so, to instruct the guardian to make settlement. There was also a petition filed in the probate court by the guardian setting forth all the facts in connection with the matter and asking of the probate court authority to make the settlement.

It was determined by both chancery and probate courts that the settlement was for the best interest of the minor. The final consummation of the settlement was had through the Federal court and a final division of the property was obtained about the first of June, 1915. The division as finally effected by agreement was amicable.

Pace and other witnesses testified to facts tending to prove that the value of the real and personal estate received by Mrs. Richardson in the division was worth at least $135,000.

Vinson, the guardian, testified: "Taking into consideration all the facts in the case, I thought the compromise was for the best interests of the minor." He also testified that Richardson never at any time had complained that Pace had neglected the litigation in any way.

The testimony of T. M. Seawel corroborates in all material particulars the testimony of Pace. His testimony shows that every legal proceeding was instituted which he and Pace considered necessary for the protection of the interest of Mrs. Richardson and that they

spent a great deal of their time in connection with the litigation and did not neglect the same at any time. He says also that Richardson did not criticise Pace as to the manner of conducting the litigation and that he never heard him complain of any neglect until this suit and his answer were filed. In regard to the compromise he states, "it was my view that the will of 1902 was valid and would govern the disposition of his property at his death in the event the wills of 1907 and 1913 and the deeds executed about that time were set aside. The will of 1902 disinherited Mrs. Richardson as I understood it." After reviewing the difficulties that confronted them in the litigation and the obstacles that they would have had to overcome if they succeeded at all he states: "I will state now that I am firmly of the opinion that the settlement that was brought about in that case was by far the best settlement that I ever participated in in any case, and, as stated, it was much better than I believed could be had in the case."

We conclude, therefore, that the appellees have wholly failed to sustain the allegations of their answer, "that Pace had breached his contract by neglect and refusing to look after and care for the interests of Willie A. Richardson in the estate of her grandfather."

The testimony of Richardson to this effect is clearly against the preponderance of the evidence. While he was greatly interested in the litigation we are not disposed to attribute his testimony to any selfish purposes of his own or to any desire on his part to do injustice to the one who had rendered him and his wife such valuable services. His own testimony shows that he was a young and inexperienced attorney and without the knowledge necessary to enable him to testify concerning the extent and value of the services that were rendered his wife. For he, says, "I had not been practicing law but a short time, and I did not know the legal phases of the case." His testimony should be viewed in the light of this statement.

The testimony clearly shows that the proceeding instituted on behalf of Mrs. Richardson to recover an interest in her grandfather's estate had brought her into deep and dangerous waters of litigation. To make for her any landing, much less the highly propitious one she attained, the faithful services of an experienced, able and skillful pilot were indispensable. These she had, according to the proof, and for these she must pay according to the contract.

The decree dismissing the complaint of appellant for $686.55 without prejudice was correct and is affirmed. This claim was for money borrowed by Richardson from Pace and did not come within the contract sued upon and was not germane to the issues raised and the relief prayed for. Pace has no lien for this.

The decree dismissing the complaint of the appellant as to the amount sued for on the contract is reversed and the cause will be remanded with directions to enter a decree in the sum of $12,500 with 6 per cent. interest from the date of settlement between Mrs. Richardson and Mrs. Erwin (June 12, 1915), and declaring the same a lien upon the property received by Mrs. Richardson as the result of the compromise of the litigation instituted by the appellant in her behalf, and for other proceedings according to law and not inconsistent with this opinion.